# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

T. J. TREMBLE,

   Petitioner,

v.              Case Number: 06-cv-13945
               Honorable Bernard A. Friedman

SHERRY BURT,

   Respondent.

_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, T. J. Tremble, a state inmate currently incarcerated at the Thumb Correctional Facility in Lapeer, Michigan, filed an unsigned *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights.[1]  (Dkt. # 1.)  The petitioner was convicted by an Arenac County, Michigan, circuit court jury of (1) two counts of first-degree murder, MICH. COMP. LAWS § 750.316, (2) one count of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, and (3) one count of unlawfully driving away a motor vehicle (UDAA), MICH. COMP. LAWS § 750.413.  He was fourteen-years old at the time.  For those convictions, the petitioner was sentenced, as an adult, to (1) life imprisonment without the possibility of parole for the first-degree-murder convictions, (2) two-years imprisonment for the felony-firearm conviction, and (3) two- to five-years imprisonment for the UDAA conviction. In his *pro se* pleadings, he alleges that (1) his confession was improperly

---

[1]On April 30, 2007, Bryan Stevenson and Rebecca C. Kiley from the Equal Justice Initiative of Alabama in Montgomery, Alabama, filed appearances on behalf of the petitioner. No additional briefs were filed by counsel.

admitted, (2) the trial court erred in refusing to change venue, (3) the prosecutor committed a *Brady*[2] violation, and, (4) both trial counsel and appellate counsel were ineffective. For the following reasons, the court denies the petition.

## I. BACKGROUND

The petitioner's troubles in this case arise as a result of the deaths of Peter and Ruth Stanley on April 19, 1997. The Stanleys were found murdered in their home, in bed, while sleeping, with gunshot wounds to their heads. The gunshot wounds were caused by a .22 rifle.

The prosecutions's theory was as follows. On the day in question, the petitioner was found at the side of a road by Officer Shon Chmielewski, Deputy Sheriff of Arenac County. Officer Chmielewski testified that he, along with Deputy William Lentz, was dispatched to investigate a report of a car in a ditch. He said that when he arrived at the scene, he found the petitioner standing beside the car. Officer Chmielewski testified that the petitioner smelled of alcohol. He also said that he learned from the petitioner that the car was owned by the Stanleys. The petitioner was arrested for driving under the influence and auto theft. After being taken to the police station and given his *Miranda*[3] warnings, it was discovered that the Stanleys were found dead. The petitioner then became the subject of the first-degree-murder investigation. Subsequently, the petitioner's parents were notified and came to the station. While there, the petitioner's parents told the police to tell him to "come clean." The petitioner eventually admitted to killing the Stanleys.

---

[2]*Brady v. Maryland*, 373 U.S. 83 (1963).

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Prior to trial, on September 18, 1997, a *Walker*[4] hearing was held to determine the admissibility of the petitioner's confession to the police. The petitioner was charged as an adult with the Stanley murders.

Officer Chmielewski testified first. According to the officer, the petitioner was read his *Miranda* rights when he arrived at the jail, somewhere between 2:55 a.m. and 3:13 a.m., during the fifteen-minute waiting period before he was given the breathalyzer test. It was Officer Chmielewski's testimony that the petitioner signed the card, did not ask for an attorney, and indicated that he wished to speak with an officer. Officer Chmielewski further testified that, as he was administering the breathalyzer test to the petitioner, Deputy Lentz came into the room and whispered in his ear that the Stanleys were found dead in their home. The officer admitted that he was present when, at about 8:30 a.m., Sheriff James Mosciski re-*Mirandized* and interviewed the petitioner. The petitioner confessed to the murders during that interview. The interview was taped.

Corrections Officer Lori Kohn also testified at the hearing. She said that she first saw the petitioner in the booking room around 2:52 a.m. According to Officer Kohn, the petitioner was handcuffed at the time. She also said that he was offered food and something to drink, which he refused. Officer Kohn testified that the petitioner told her that he threw a flashlight into the river. That comment was unsolicited. She also noted that the petitioner had an abrasion on his hand.

Sheriff Mosciski testified next. According to him, around 3:15 a.m., he was notified by Officer Chmielewski about the incident and immediately went to the station. When he arrived, he asked the petitioner if he had anything to say. The petitioner told him that the cuffs were too tight;

---

[4]*People v. Walker (On Reh'g)*, 374 Mich. 331, 132 N.W.2d 87 (1965). Also at the hearing, motions were heard, and denied, regarding disqualification of the prosecuting attorney, change of venue, and a referral to probate court.

3

the sheriff then loosened the cuffs. It was Sheriff Mosciski's testimony that he called the petitioner's parents about 5:30 a.m. They arrived at the station about 7:30 a.m., and requested to speak with their son. However, the sheriff told them that he wanted to speak to him first. According to Sheriff Mosciski, the parents were read their *Miranda* rights and signed the card. Sheriff Mosciski further testified that about 8:30 a.m., the petitioner was brought back to his office, at which time he then re-*Mirandized* him and asked him if he wished to talk, to which the petitioner replied, "Yes." (*Walker* Hr'g Tr. 78, Sept. 18, 1997.) The petitioner then confessed to the Stanley murders.

The petitioner's parents also testified at the hearing. They both said that they signed the *Miranda* form, asked to see their son, to which they were told they could not because the officers were questioning him, and asked for counsel.

Deborah Luberda, secretary to the prosecutor, also testified. According to her testimony, she heard the petitioner's father say that there was no reason to get "a high-powered attorney because they caught him with the evidence or in the act." (*Walker* Hr'g Tr. 149-50, Sept. 18, 1997.)

The trial court took the matter under advisement and issued a written, twenty-five-page opinion on October 6, 1997, denying the motion to suppress the petitioner's confession. The trial court stated in pertinent part:

> The Legislature having determined upon recent amendment of the laws of this state that a 14 year old may be accountable as an adult and waiver having occurred in this case, this Court must assess the "totality of the circumstances" in that light.
>
> A fair number of years prior to the recent Michigan Legislative enactments in the case [*Fare v. Michael C.*], 442 U.S. 707, 724[-25], [] (1979)[,] the United States Supreme Court in addressing the assessment of juveniles making statements when under suspicion for a crime indicated:
>
> "We discern no persuasive reasons why any other approach is

4

> required where the question is whether a juvenile has waived his rights as opposed to whether an adult has done so."

That having been said, this Court will resist the temptation to give into sympathy, and inappropriate consideration in its assessing of the 'totality of the circumstances.'

\* \* \*

> Other facts pertinent to the Court's assessment are as follows: Custody can fairly be said to have been of short duration. By the time of interrogation with the Sheriff at 8:30 a.m., there was probable cause regarding murder charges. * * * Mr. Tremble was Mirandized twice. * * * There is no indication he is below average intelligence. * * * In short there is no record to support a finding by the Court that the Defendant was coerced into making his statement and accordingly this Court must conclude the statements made were voluntary.

*People v. Tremble*, No. 97-2455-FC at 19-23 (Arenac County Circuit Court, Oct. 6, 1997).

At that same hearing, the trial court heard the petitioner's argument on his motion to change venue. The trial court expressed concern in attempting to find an impartial jury in the county because of the extensive media coverage. However, it was the trial court's opinion that an attempt should be made and therefore, the motion was denied.

Trial began on October 21, 1997, and lasted five days. It took three-and-one-half days to impanel the jury. On October 28, 1997, testimony began. Kerri Bussinger was first to testify. She said that she saw the petitioner, on the night in question, driving a black car. According to Bussinger, the petitioner almost ran into her car.

Amy Vargo testified next. She said that she was on her way to work, on the night in question, when she noticed a car in the ditch. Vargo said that she stopped to help. She testified that she took the petitioner back to her house in order to call a tow truck. She said that she then drove him back to the car. Vargo described the petitioner as polite.

Officer Chmielewski also testified. His testimony was similar to that given at the *Walker*

hearing, with a few additions.  According to the officer, he arrived at the scene at approximately 2:00 a.m.  He testified that when he asked the petitioner what happened, the petitioner told him that he swerved to miss a deer or a dog.  When asked about his driver's license, the petitioner stated that he had no drivers license.  When asked about the car, the petitioner said that the car belonged to his stepfather, Mr. Stanley.  The petitioner told the officer that his stepfather was at his grandfather's house, but when questioned about the phone number, he responded that he did not know it.  When asked the whereabouts of his mother, the petitioner said that she was working at a convenience store. Officer Chmielewski testified that he had dispatch call the store but no one by that name was employed there.

Officer Chmielewski further testified that he asked the petitioner if the car was stolen.  The petitioner told him that it was and said that it was stolen from the Stanley's garage.  The petitioner told the officer that he broke a window in the garage, unlocked the door, found the keys in the car, and then drove off.  Officer Chmielewski said that he believed that the petitioner had been drinking because of the smell of alcohol on his breath, but said that he was not slurring his speech and was not stumbling.  Officer Chmielewski testified that, while at the scene of the accident, he contacted Michael Prohaska, a probation officer, at which time he discovered that the petitioner was fourteen-years-old.  He then took the petitioner to the station; the petitioner was placed under arrest for driving while under the influence and auto theft.

Subsequently, at the police station, at about 2:55 a.m., Officer Chmielewski read the petitioner his *Miranda* rights.  Following, at around 3:13 a.m., he administered the breathalyzer test on the petitioner, which registered .05.  As the results of the breathalyzer test were being printed out, Officer Chmielewski testified that he was informed, by Deputy Lentz, that Mr. and Mrs. Stanley

6

were found dead in their home.

Lori Kohn, a Corrections Officer, testified that she observed the petitioner when he first arrived at the jail.  She said that he had a slight order of alcohol on his breath but that he did not slur his speech.  According to Officer Kohn, the petitioner had no problems answering any questions when asked.  She also noted that he had abrasions on his hands.

Mary Jane Hart, another Corrections Officer, testified that she spoke to the petitioner while he was in the booking room; she said that she never observed any slurred speech and detected only a slight odor of alcohol.  According to Officer Hart, it was her opinion that the petitioner was not intoxicated.  Officer Hart also testified that the standard procedure for someone in the booking room was to be handcuffed if they were being charged with a serious crime; the length of time of the handcuffing usually depended on the arrest and on the charge.

Sheriff Mosciski testified that, on the night in question, Officer Chmielewski called him to inform him of the events taking place and advised him of a juvenile they had caught in a stolen car and a possible double homicide.  According to Sheriff Mosciski, he spoke with the petitioner when he arrived at the jail at about 3:35 a.m., at which time the petitioner only confessed to stealing the car.  Sheriff Mosciski said that he informed the petitioner that he would be in his office if he would like to talk to him.

About twenty minutes later, Sheriff Mosciski went back to the booking room where the petitioner was being held and asked him if he had anything he wanted to talk about.  The petitioner told him that his handcuffs were too tight, so, the sheriff loosened the cuffs.  Sheriff Mosciski said it was a normal procedure for defendants to be handcuffed for several hours, while in the booking room.  Again, Sheriff Mosciski told the petitioner that he would be in his office if he wanted to talk

7

to him about anything.

Sheriff Mosciski further testified that, at approximately 5:30 a.m., he called the petitioner's parents, and advised them that the petitioner was being held for zero tolerance and possession of stolen property. According to Sheriff Mosciski, a police vehicle was then sent to their house.

Sheriff Mosciski testified that Mr. and Mrs. Tremble arrived at the police station around 7:30 a.m. Lieutenant Patricia A. Skarbek was present when he informed them why the petitioner was in custody. The sheriff told them that, after further investigation, it was determined that the petitioner was a suspect in a double homicide. The parents requested to talk to the petitioner but Sheriff Mosciski said that he wanted to question him first. According to the sheriff, the parents agreed that he could talk to the petitioner first; he believed that is was Mrs. Tremble who told him to tell the petitioner, "TJ, please come clean." (Trial Tr. vol. VI, 1209, Oct. 29, 1997). Sheriff Mosciski testified that he told the parents that it was normal procedure that he talk to the petitioner first; the parents did not object. Although the parents were not denied the right to sit in on the questioning, Sheriff Mosciski did not ask them specifically to sit in. Additionally, the parents made no request to be present during the petitioner's questioning. Sheriff Mosciski testified that he taped his interview with the petitioner. He acknowledged that Officer Chmielewski and Lieutenant Skarbek were present during the questioning. The tape was admitted into evidence and played for the jury.

James Tremble, the petitioner's father, testified that he gave the petitioner a target gun, a .22 rifle, which he kept in his bedroom. It was Mr. Tremble's testimony that, after he received a call from the police, two officers came to his house and asked if they could search the petitioner's bedroom; Mr. Tremble testified that he consented to the search. Mr. Tremble also testified that he gave his son a beer that night. According to Mr. Tremble's testimony, he asked for counsel and also

asked if he could speak to his son.  He said that he was refused both.  That request was made in the presence of Sheriff Mosciski and Lieutenant Skarbek, neither of whom denied there was a request for counsel.

Beverly Jean Tremble, the petitioner's mother, also testified.  Mrs. Tremble acknowledged that she and her husband gave the two officers, who came to the house that night, permission to search the petitioner's bedroom.  She recalled seeing the petitioner's rifle in his bedroom that night, before she went to bed.  According to Mrs. Tremble, after the officers left their house that night, a friend took them to the police station.  She testified that her husband told the officers to tell the petitioner to tell the truth.  On cross-examination, Mrs. Tremble testified that she asked both the sheriff and the lieutenant if they could talk to their son; both refused.  She also testified that they asked for an attorney; that request was also denied.

Lieutenant Skarbek testified that, when the petitioner was questioned, he appeared to be awake and alert and was not slurring his words.  According to the lieutenant, the petitioner's hands were cuffed behind his back in order to preserve evidence; it was believed that there were possible blood stains on his hands.  Lieutenant Skarbek also testified that she believed the parent's request for a counselor was for counseling, such as a therapist.[5]  She said that the Trembles mentioned that they had a lot of things going on in their lives and that they were on medication.

Further testimony revealed that the petitioner had a sandwich and a pop the evening before the questioning, at approximately 11:30 p.m.  While in custody, he declined breakfast when it was offered to him.  Up until the time of his questioning in the sheriff's office, the petitioner was handcuffed and seated in a cushioned chair with a cushioned back.  The handcuffs were removed

---

[5]At the *Walker* hearing, the trial court found that belief to be disingenuous.

9

for

fingerprinting and for forensic experts to check his clothes and his hands.  At no time did anyone

hear the petitioner ask for his parents, an attorney, or to make a phone call.

After five days of trial, the petitioner was convicted of the above-stated charges and

sentenced as stated.  Following his sentencing, he filed a direct appeal with the Michigan Court of

Appeals, raising the following claims:

> I.      The confession was improperly allowed into evidence.
>
> II.     The revised automatic waiver statute used to charge and sentence [the
>         petitioner] as an adult is unconstitutional.
>
> III.    The trial court erred in refusing to change venue.

On February 1, 2000, the Michigan Court of Appeals issued an unpublished *per curiam*

opinion affirming the petitioner's convictions.  *People v. Tremble*, No. 208854, 2000 WL 33534678

(Mich.Ct.App. Feb. 1, 2000).  Subsequently, the petitioner filed an application for leave to appeal

that decision with the Michigan Supreme Court, raising the same claims as raised in the Michigan

Court of Appeals.  On December 4, 2001, the Michigan Supreme Court denied the application.

*People v. Tremble*, 465 Mich. 920, 638 N.W.2d 749 (2001) (Cavanagh, J., and Kelly, J., would grant

leave to appeal).

On November 5, 2002, the petitioner filed a motion for relief from judgment, pursuant

Michigan Court Rules 6.500 *et. seq.*, in the trial court, asserting four new claims:

> I.      [The petitioner] was denied due process of law and a fair trial when the
>         prosecutor withheld key documents in violation of the rules of discovery.
>
> II.     [The petitioner] was denied due process of law and a fair trial when the trial
>         court erred in admitting [his] statement into evidence and in admitting
>         evidence that was obtained as a result of an illegal search.

III.    [The petitioner] was denied the effective assistance of trial counsel when counsel failed to seek suppression of [his] statement on the proper legal basis, failed to seek to suppress the fruits of an illegal search, and where counsel conceded [his] guilt during closing argument.

IV.    [The petitioner] was denied the effective assistance of appellate counsel.

On December 18, 2003, the circuit court issued an order denying the petitioner's motion for relief from judgment. The petitioner appealed that decision to the Michigan Court of Appeals. On April 7, 2005, the application was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v Tremble*, No. 257439 (Mich.Ct.App. Apr. 7, 2005). The petitioner's subsequent application for leave to appeal to the Michigan Supreme Court was denied on March 27, 2006, "because he failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Tremble*, 474 Mich. 1091, 711 N.W.2d 54 (2006).

The petitioner filed his present habeas petition challenging his convictions on the following grounds:

I.    [The petitioner's] confession was improperly admitted.

II.    The trial court erred in refusing to change venue.

III.    [The petitioner] was denied due process and a fair trial when the prosecutor withheld key documents in violation of the rules of discovery.

IV.    [The petitioner] was denied the effective assistance of counsel when defense counsel failed to seek suppression of [his] statement on the basis that it was in violation of his Fifth, Sixth, and Fourteenth Amendment rights against self incrimination and his right to counsel.

V.    [The petitioner] was denied the effective assistance of counsel on direct appeal in violation of U.S. Const. Amends. VI, XIV.

11

## II.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's habeas corpus review of state court decisions.  Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed."  *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts.  *Williams*, 529 U.S. at 407-08.  Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.  *Id.* at 407;

12

*Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412. Additionally, this court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous.").

### III. DISCUSSION

### A. The Petitioner's Confession

In his first habeas claim, the petitioner alleges that his confession should have been suppressed because it was given involuntarily. His argument is that because he was fourteen-years-old at the time of his arrest, and because he was originally arrested only for a zero-tolerance violation and possession of a stolen vehicle, the police were required to comply with the arrest procedures in the juvenile system, which mandated immediate removal to the juvenile division of the probate court. The Michigan Court of Appeals, the last court to issue a reasoned decision regarding this claim, stated:

> Defendant first argues on appeal that the trial court erred in denying his motion to suppress his confession. Defendant contends that suppression was required because after he was arrested, he was not immediately taken before juvenile authorities as required by M.C.L. § 764.27; MSA 28.886, and because his confession

13

was not voluntary.  Statutory interpretation is a question of law that we review de novo.  When reviewing a trial court's determination of voluntariness, this Court examines the entire record and makes an independent determination.  However, deference is given to the trial court's assessment of the weight of the evidence and credibility of the witnesses, and the trial court's findings will not be disturbed unless they are clearly erroneous.  A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that a mistake has been made.

Defendant, then fourteen years old, was arrested on April 19, 1997.  MCL 764.27; MSA 28.886, as amended by 1996 PA 255 (effective January 1, 1997), provides in pertinent part as follows:

> Except as otherwise provided in section 606 of the revised judicature act of 1961 . . . being section 660.606 of the Michigan Compiled Laws . . . if a child less than 17 years of age is arrested, with or without a warrant, the child shall be taken immediately before the family division of circuit court of the county where the offense is alleged to have been committed, and the officer making the arrest shall immediately make and file, or cause to be made and filed, a petition against the child as provided in . . . sections 712A.1 to 712A.31 of the Michigan Compiled Laws. [MCL 764.27; MSA 28.886.]

The statute, by its very terms, must be read in conjunction with M.C.L. § 600.606; MSA 27A.606, as amended by 1996 PA 260 (effective January 1, 1997), which provides that "[t]he circuit court has jurisdiction to hear and determine a specified juvenile violation if committed by a juvenile 14 years of age or older and less than 17 years of age."  First-degree murder in violation of M.C.L. § 750.316; MSA 28.548 is listed as a specified juvenile violation under M.C.L. §600.606(2)(a); MSA 27A.606(2)(a).  Under M.C.L. § 764.1f; MSA 28.860(6), the prosecutor has authority to proceed in either juvenile or circuit court when confronted with a juvenile who is charged with certain enumerated felonies, including first-degree murder.

There is no dispute that in this case the prosecutor opted to proceed in circuit court and charge defendant with first-degree murder.  Defendant argues that because he was originally arrested only for a "zero tolerance" violation and possession of a stolen automobile, the police were required to comply with arrest procedures in the juvenile system and their failure to do so required suppression of his subsequent confession.  However, the voluntary statement of a juvenile who is not immediately taken to the juvenile division of the probate court upon arrest is admissible if the juvenile is charged as an adult.

*Tremble*, No. 208854, 2000 WL 33534678, at *1-2 (citations omitted).

14

The Michigan Court of Appeals also held that, under the totality of all the circumstances, the petitioner's statement to the police was voluntary:

> In any event, the failure to take an arrested juvenile immediately to the juvenile division of the probate court does not per se require suppression of a statement made by the defendant. Rather, the proper test for determining the admissibility of a juvenile's confession is whether, under the totality of the circumstances, the defendant's statement was made voluntarily. The factors that must be considered in applying the totality of the circumstances test to determine the admissibility of a juvenile's confession include (1) whether the requirements of *Miranda v. Arizona*, have been met and the defendant clearly understands and waives those rights, (2) the degree of police compliance with M.C.L. § 764.27; MSA 28.886 and the juvenile court rules, (3) the presence of an adult parent, custodian, or guardian, (4) the juvenile defendant's personal background, (5) the accused's age, education and intelligence level, (6) the extent of the defendant's prior experience with the police, (7) the length of detention before the statement was made, (8) the repeated and prolonged nature of the questioning, and (9) whether the accused was injured, intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food, sleep, or medical attention.

> Here, defendant was given the *Miranda* warnings twice prior to his confession. He indicated that he understood his rights and he waived those rights. After reading defendant his *Miranda* rights, Sheriff Mosciski asked defendant if he wanted to "talk now" and defendant said "[y]es." As indicated above, because defendant was charged as an adult, the police were not required to comply with the requirements of M.C.L. § 764.27; MSA 28.886. Although neither defendant's parents nor an attorney were present during the questioning, defendant, after being advised of his rights, did not request the presence of his parents or an attorney. While defendant was only fourteen-and-a-half years old and only had an eighth grade education, there is nothing in the record to indicate that he could not read and write or could not understand the serious nature of the charges against him. In fact, a juvenile corrections officer explained to defendant, prior to his confession, that the charges against him were very serious. Moreover, there is nothing in the record to indicate that defendant was intellectually challenged.

> Defendant was not detained for a lengthy period before he made his statement. He was brought into the jail at approximately 3:00 a.m. Defendant went through the booking procedure and submitted to a breathalyzer test. Evidence technicians from the State Police Post collected evidence from defendant at approximately 6:45 a.m. Defendant's parents appeared at the jail at 7:30 a.m. and consented to allow the police to talk to defendant. Defendant gave his statement at 8:30 a.m. We do not believe that defendant's five-and-a-half hour detention prior to his confession was unreasonable under the circumstances.

15

Furthermore, defendant does not claim, and there is no indication in the record, that he was subjected to repeated or prolonged questioning in this case. There is no indication that defendant was injured or sick when he confessed to killing the victims in this case. Additionally, although defendant had two alcoholic beverages approximately eight hours prior to the confession and had a blood alcohol level of .05 at 3:15 a.m., there is no indication that he was intoxicated at 8:30 a.m. when he confessed to the murders. Moreover, although defendant had not slept or eaten for at least nine hours prior to the questioning, there is no evidence that he was not alert at the time of his confession. In fact, Sheriff Mosciski testified that defendant appeared to be alert and awake during questioning. Defendant, who had eaten a sandwich at 11:30 p.m. the previous day, declined the breakfast that was offered breakfast at 7:30 a.m. at the jail. Therefore, he was not deprived of food prior to the confession. Although defendant was handcuffed for a number of hours, those handcuffs were loosened upon defendant's request. There is nothing in the record to indicate that defendant was mistreated in any way by the police.

Considering the totality of the circumstances, we conclude that the trial court did not err in finding that defendant's confession was voluntary. Defendant has cited no factor or combination of factors that indicates that his will was overborne and his capacity for self-determination critically impaired, or that his confession was not the product of an essentially free and unconstrained choice. Although defendant claims that he was absolutely exhausted and utterly confused prior to his confession, there is no support for those assertions in the record.

*Tremble*, No. 208854, 2000 WL 33534678, at *2-3 (citations omitted).

This court acknowledges that it is bound by the Michigan Court of Appeals' interpretation of the juvenile-offender law; the power of the writ of habeas corpus does not extend beyond the application of federal law, and federal courts cannot intervene in order to correct a perceived violation of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, a federal-habeas court does not sit as an additional state appellate court to review a state court's interpretation of its law. *Ovieda v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). Nor can a federal habeas court grant relief for a perceived error in the application of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The interpretation of Michigan's juvenile-offender statute is a state-law issue. The Michigan Court of Appeals specifically discussed Michigan law with respect to juveniles in custody, and,

applying the facts of the petitioner's case to the law in question, it determined that, because the petitioner was charged as an adult, the juvenile court did not have jurisdiction over him.  MICH. COMP. LAWS § 600.606.

Against that backdrop, the court does not disagree with the Michigan Court of Appeals' decision that, MICH. COMP. LAWS § 764.27—the automatic waiver statute—allows the circuit court, rather than the juvenile court, jurisdiction over a juvenile who is charged with certain enumerated felonies.  The petitioner was initially arrested for zero tolerance when he was found with a vehicle that was not his own.  While the police were attempting to immediately turn the petitioner over to the juvenile court, it was discovered that he was a suspect in a double homicide.  The petitioner was a suspect because the murdered couple owned the vehicle in which he was found.  The petitioner had only been at the police station for fifteen minutes prior to the double-homicide connection coming to light.  Thereafter, the police were under no obligation to transfer him to the juvenile court, or to contact his parents, given that he was now going to be tried as an adult.  Thus, the Michigan Court of Appeals was correct in its assessment of the petitioner's claim that he should have been immediately removed to the juvenile division of the probate court.

Moreover, this court finds the petitioner's involuntary-confession claim without merit.  The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused.  *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).  When a defendant claims that his or her confession was coerced, the government has the burden of proving that the confession was voluntary by a preponderance of the evidence.  *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).  "[P]olice overreaching is necessary for a confession to be found invalid under the Due Process Clause of the Fourteenth Amendment."  *Clark v. Mitchell*, 425 F.3d 270, 283

17

(6th Cir. 2005) (citing *Connelly*, 479 U.S. at 164). "A confession is considered involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession." *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (citing *Connelly*, 479 U.S. at 165-66.) Factors to be considered include the defendant's age, education, and intelligence; whether the defendant was informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). When a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to the interrogating officers, a "lesser quantum of coercion" is necessary to call a confession into question. *Hill*, 300 F.3d at 682 (citing *United States v. Sablotny*, 21 F.3d 747, 751 (7th Cir. 1994)); *see also Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996).

In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the United States Supreme Court held that once the accused requests counsel, interrogation must cease until counsel has been made available, unless the suspect himself initiates further communication, exchanges, or conversation with the police. *See Minnick v. Mississippi*, 498 U.S. 146, 152 (1990) ("[w]e further hold that an accused . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

It is uniformly agreed by the courts that the age of a defendant minor is an important factor to be considered in determining the voluntariness of his or her confession. *Gallegos v. Colorado*, 370 U.S. 49, 53 (1962). However, it has been stated that the fact of minority alone is insufficient to warrant a finding of involuntariness and inadmissibility. As a general rule, minority is simply

18

another factor to be considered in determining voluntariness and there is no distinct or separate rule of evidence applicable to confessions of minors.

The voluntariness of a confession, whether made by a juvenile or an adult, is evaluated on the basis of the totality of the circumstances surrounding that confession. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)*; Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In juvenile cases, the totality approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725 (citing *North Carolina v. Butler*, 441 U.S. 369 (1979)). The Supreme Court in the past has spoken of the need to exercise "special caution" when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. *In re Gault*, 387 U.S. 1, 45 (1967); *Gallegos*, 370 U.S. at 55; *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948).

The factors that must be considered in applying the totality of the circumstances test to determine the admissibility of a juvenile's confession include: (1) whether the requirements of *Miranda* have been met and the defendant clearly understands and waives those rights; (2) the degree of police compliance with statutory requirements, and the juvenile court rules; (3) the presence of an adult parent, custodian, or guardian; (4) the juvenile defendant's personal background; (5) the accused's age, education, and intelligence level; (6) the extent of the defendant's prior experience with the police; (7) the length of detention before the statement was made; (8) the repeated and prolonged nature of the questioning; and (9) whether the accused was injured, intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food, sleep, or

19

medical attention. *Friday v. Pitcher,* 200 F.Supp.2d 725, 735 (E.D. Mich. 2002).

Cases which have found a juvenile's confession involuntary often include some form of mental coercion, denial of rights, intimidation, threats, or physical abuse in obtaining the confession. For example, in *Haley, supra,* a fifteen-year old's confession was found involuntary after the boy was taken from his home in the middle of the night and subjected to relentless questioning. *Haley,* 332 U.S. at 597-601. The boy had been kept in custody for over three days without being taken before a magistrate or allowed to see a parent or attorney. *Id.* He was not informed of his right to counsel. And, once before the magistrate, the boy appeared "bruised and skinned." *Id.*

Similar to *Haley,* the Fifth Circuit found an eleven-year old's confession involuntary after the child had been held in custody, unaccompanied by a parent or lawyer, for over three days. *Murray v. Earle,* 405 F.3d 278, 288 (5th Cir.2005). The girl was found to be of "below-normal intelligence," had no experience with the criminal justice system, was only briefly informed of her rights prior to the interrogation, and the police told her that everyone "knew" what happened and she could only help her family by telling the truth. *Id.* at 288-289.

The coercion present in *Haley* and *Murray* starkly contrasts with two other cases where juveniles' confessions were found voluntary. In *Fare, supra,* a sixteen-year old's confession was found to be voluntary where there was no evidence that the juvenile had been "worn down" by improper interrogation tactics, lengthy questioning, trickery, or deceit. *Fare,* 442 U.S. at 725-26. The boy had been arrested several times and had considerable experience with police. *Id.* He was

told he was being questioned in connection with a murder, his rights were explained fully, and no facts indicated he was unable to understand his rights. *Id.*

20

In this case, the difficulty a vulnerable child of fourteen would have in making a critical decision about waiving his *Miranda* rights and voluntarily confessing cannot be understated. The *Fare* decision makes quite clear that all juvenile confessions are to be assessed under the totality of the circumstances standard, and that no one factor will be dispositive. *Fare*, 442 U.S. at 725-27.

In *Gachot v. Stalder*, 298 F.3d 414, 420-21 (5th Cir. 2002), the Fifth Circuit found a fifteen-year old's confession to the murder of his parents voluntary, after he freely agreed to go to the sheriff's office to answer questions. *Id.* The boy was accompanied by his older half-brother, was repeatedly advised of his rights, and the officers were "non-oppressive," treating him with "kid gloves." *Id.* at 420. He was not subject to physical abuse or relentless questioning, or confronted with "spurious untruths." *Id.*

Here, the court finds that the petitioner's case is much more akin to the voluntary confessions in *Gachot* and *Fare*, than those in *Murray* and *Haley*. Like the juveniles in *Gachot* and *Fare*, the petitioner was apprised of his rights, twice.

Although the petitioner alleges that he requested an attorney, given the testimony at the *Walker* hearing, the record establishes that he never claimed that he requested, but was denied, an attorney. (As detailed more fully in the Statement of Facts herein, the record reveals that the petitioner's statement was voluntarily made under the totality of the circumstances.) The petitioner was read his *Miranda* warnings twice–prior to his breathalyzer and prior to his questioning by Sheriff

Mosciski. He signed the *Miranda* warning. When the sheriff asked whether he wanted to talk to him thereafter, he indicated yes, and he proceeded to answer all questions asked. At no point during

21

the interview did the petitioner indicate that he wanted a lawyer or his parents present.

Therefore, taking into account the totality of the circumstances surrounding this case, the court finds the following. At the time of his arrest, the petitioner was fourteen-years-old. He was in the ninth grade, having just completed the eighth grade. He did not alleged that he was illiterate or that he was not intelligent. Furthermore, he was not a stranger to the legal system, as in 1991 he was given six-months probation for breaking and entering an unoccupied building. And, at the time of the present offense, he was on juvenile probation for breaking and entering a vehicle.

Moreover, the petitioner's detention was not unreasonable, given the severity of the offense. He was taken to the police station at approximately 3:00 a.m., and he made his statement to the sheriff at approximately 8:30 a.m. During that time, he was not interrogated or coerced. He was free to move around the booking room, even though handcuffed, in order to stretch his legs. He was seated in a cushioned chair and was not pressured to make a statement. He was offered breakfast, but refused to eat anything. Had he been hungry, he could have eaten. And, although he did not sleep during that time, he never indicated a need to lie down and he was never observed to be inattentive or drowsy. There was no repeated or prolonged line of questioning. In fact the only line of questioning occurred at 8:30 a.m., at which time he confessed to the two killings.

Against that backdrop, the court finds that the petitioner knowingly and intelligently waived his *Miranda* rights, and voluntarily made inculpatory statements to the police. He was not threatened at any point, and there were no promises made to him in exchange for his confession. Because the

state courts' adjudications regarding the petitioner's confession were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, the petitioner is not entitled to habeas relief on this claim.

## B.  Change of Venue

Next, the petitioner asserts that the trial court erred in refusing to grant his request for a change of venue because of the pretrial publicity surrounding his case.  The Michigan Court of Appeals considered and rejected this claim:

> Defendant's final argument on appeal is that the trial court erred in denying his motion for change of venue.  We disagree.  The court's action in ordering or refusing a change of venue is discretionary and will not be disturbed on appeal unless there clearly appears to be a palpable abuse of discretion.

> Generally, defendants must be tried in the county where the crime is committed.  However, a court may, in special circumstances where justice demands or statute provides, change venue to another county.  In *Jendrzejewski*, the Court noted that federal precedent has used two approaches to determine whether the failure to grant a change of venue is an abuse of discretion.  "Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice."

> The killings in this case occurred in a small community of approximately 1,000 residents.  Defendant claims, and plaintiff admits, that there was pretrial publicity in this case.  However, juror exposure to newspaper accounts of the crime for which a defendant has been charged does not in itself establish a presumption that the defendant has been deprived of a fair trial because of pretrial publicity.  Rather, "the initial question is whether the effect of pretrial publicity on a relatively small jury pool . . . was such 'unrelenting prejudicial pretrial publicity [that] the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue.'"

> A review of the exhibit prepared by defendant in connection with his motion for change of venue reveals that, over a five-month period, there were eight articles regarding this case in the Arenac County Independent and twenty articles in The Bay City Times.  Further, there is some indication that there was minor television and

radio coverage of this case. Although defendant claims that some of the articles were somehow sensational or tabloid-like, a review of the articles reveals that they are largely a factual recounting of news events, including the basic facts surrounding the killings, the court proceedings and side issues such as where defendant would be housed during the pendency of this matter. The fact that a few of the articles mentioned that there seemed to be no reason for the killings or that there was no readily discernible motive for the murders does not make the articles inflammatory or sensational. We conclude that the pretrial publicity in this case was not so unrelenting or prejudicial that the entire community can be presumed to have been exposed to and prejudiced by it.

The next question is whether there was such a high percentage of the venire who admitted to a disqualifying prejudice that community bias may be inferred. In *Jendrzejewski*, the Court found that even where twenty-five percent of the venire admits to a disqualifying prejudice, that does not constitute a community so prejudiced against the defendant as to impeach "the indifference of jurors who displayed no animus of their own." Our review of the record in this case shows that while many of the jurors admitted to having some prior knowledge of the incident in question, only about twenty-two percent admitted to having an opinion regarding the guilt or innocence of defendant. We do not believe that this suggests a community poisoned against defendant or a community "so inflamed by pretrial publicity that it would overcome jurors' assertions of impartiality." Therefore, we find that the trial court did not abuse its discretion in denying defendant's motion for change of venue.

*Tremble*, No. 208854, 2000 WL 33534678, at *4-5 (citations omitted).

The United States Supreme Court has held that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue. *Irvin v. Dowd*, 366 U.S. 717, 722-724 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Joseph v. Coyle*, 469 F.3d 441, 468 (6th Cir. 2006), *cert. denied*, 127 S.Ct. 1827 (2007); *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-943 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007); *Ritchie*, 313 F.3d at 952-953; *Gall v. Parker*, 231 F.3d

24

265, 309 (6th Cir. 2000); *Nevers*, 169 F.3d at 362-363; *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (*en banc*). For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Gall*, 231 F.3d at 310; *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle*, 161 F.3d at 382.

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court must still determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for determining if actual prejudice has occurred is a searching *voir dire* of prospective jurors. *Id.* The Supreme Court has rejected the notion that the trial court "must ask questions regarding the content of the news reports . . . to which potential jurors may have been exposed." *Joseph*, 469 F.3d at 468 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 424-25 (1991)). Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of a prospective juror's impartiality. *Id.* at 366-367. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Ritchie*, 313 F.3d at 962.

In this case, while there was news coverage of the murders preceding trial, it was not extraordinary in extent or substance, given the heinous nature of the crimes. Here, a review of the transcript does not indicate that the petitioner was denied a fair trial. Of the sixty-two jurors excused, only twenty-one were excused because they were not able to keep an open mind–seventeen percent of the pool. Federal precedent holds that even where twenty-five percent of the jury pool

25

indicated that they could not remain impartial, such a fact did not reflect a community so inflamed by "pretrial publicity as to call into question the seated jurors' assertions of impartiality." *United States v. Morales*, 815 F.2d 725, 735 (1st Cir. 1987).

In the present case, potential jurors were extensively questioned by the attorneys and the trial court, over three-and-one-half-days of impaneling, to determine if they could be impartial and lay aside any preexisting knowledge and opinions, if any existed. The final fourteen jurors that were seated as the panel swore under oath that they were able to keep an open mind as to the guilt or innocence of the petitioner in this case.

Against that backdrop, the court finds that the Michigan Court of Appeals' decision is neither contrary to, not an unreasonable application of, clearly established Supreme Court precedent. Therefore, the petitioner is denied habeas relief regarding his change-of-venue claim.

### C. *Brady* Violation and Ineffective Assistance Counsel Claims

In his third claim, the petitioner alleges that he was denied due process and a fair trial when the prosecutor allegedly withheld a key document in violation of the rules of discovery. In his fourth claim, he asserts that he was denied the effective assistance of trial counsel when trial counsel failed to seek suppression of his statement on the basis that it was in violation of his Fifth, Sixth, and Fourteenth Amendment rights against self incrimination and his right to counsel. And, in his fifth claim, the petitioner contends that he was denied the effective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment rights.

Although the petitioner presented these issues in his motion for relief from judgment and subsequent appeals, he failed to do so in his appeal of right. As a result, the Michigan trial and appellate courts denied leave to appeal the claims in his motion for relief from judgment on the basis

26

of Mich.Ct.R. 6.508 (D).  Subchapter 6.500 of the Michigan Court Rules governs motions for relief from judgment in criminal cases in Michigan and provides the exclusive procedure for challenging a conviction or sentence after the conclusion of the defendant's direct appeal of right.  In *Burroughs v Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002), the Sixth Court considered the form order used by the state appellate courts here and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state-procedural rule.  *See also McFarland v. Yukins*, 356 F.3d 688, 697-98 (6th Cir. 2004).

Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may only obtain habeas review of such claims if he can establish "cause and prejudice" or that the failure to review the claims would result in a "fundamental miscarriage of justice."  *Strickler v. Greene*, 527 U.S. 263 (1999).  There are several prerequisites that must be met before actually applying the test to any kind of procedural default.  *See Haliym v. Mitchell*, 492 F.3d 680, 690-91 (6th Cir. 2007).  First, there must be a firmly established state procedural rule which is applicable to the petitioner's claim and the petitioner must not have complied with the rule.  *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  Second, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the petitioner's federal claims.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Finally, the procedural default must be an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.  *Wilson v. Mitchell*, 498 F.3d 491, 499 (6th Cir. 2007).  Finally if the court has determined that a state procedural rule was violated and that the rule was an "adequate and independent" state ground, then the petitioner must demonstrate, under [*Wainwright v. Sykes*, 433 U.S. 72 (1977)], that there was cause for him

27

not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Ineffective assistance of appellate counsel may be sufficient cause. *Manning v. Hoffman*, 269 F.3d 720, 723-24 (6th Cir. 2001). In this case, although the petitioner asserts that appellate counsel did not provide effective assistance given the failure to raise the additional claims in the appeal of right, this argument does not constitute sufficient cause to excuse the procedural default. In order for attorney error to constitute cause, it must rise to the level of ineffective assistance of counsel under the standard of *Strickland v Washington*, 466 U.S. 668, 687-94 (1984).

Under *Strickland*, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-94. Second, the petitioner must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* "With regard to the performance prong of the inquiry, . . . judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* at 689.

While appellate counsel did not raise every conceivable claim in the petitioner's appeal of right, the Supreme Court has held that failure to raise every colorable argument does not constitute ineffective assistance of counsel. Specifically, in *Jones v Barnes*, 463 U.S. 745, 753 (1983), the Supreme Court stated that "[a] brief that raises every colorable issue runs the risk of burying good arguments – those that, in the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound made up of strong and weak contentions." Here, the three claims that counsel did

pursue on appeal were thoroughly argued, and although the arguments were ultimately unsuccessful, the Michigan Court of Appeals issued an opinion addressing each issue in detail. The petitioner has therefore failed to show that, had his appellate attorney asserted the additional claims, the appeal of right would have been successful.

Although the petitioner claims that the prosecutor withheld exculpatory evidence—namely, his *Miranda*-rights form wherein he requested counsel—he cannot show that the document was withheld or that the evidence would have resulted in a different outcome at trial. The petitioner states that the *Miranda* document "was apparently withheld from the defense." The petitioner cannot state with certainty that the document was withheld. Moreover, during the *Walker* hearing regarding potential suppression of the petitioner's statement, the petitioner never alleged that he requested an attorney either prior to or during questioning. Rather, testimony at the hearing focused on whether his parents requested counsel on his behalf. Moreover, when the petitioner's parents arrived to the police station, his father asked the police to tell him to "come clean."

The record establishes that the petitioner never claimed he requested, but was denied, an attorney. Therefore, even if appellate counsel had argued on appeal that the petitioner's confession should have been suppressed—under the additional theory that the prosecution withheld the *Miranda* statement wherein he requested an attorney, and that he was denied his right to consult with an attorney—such an argument would have been meritless given the testimony at the *Walker* hearing. And counsel was not required to take measures that, ultimately, would have been pointless. Further, even if appellate counsel was ineffective for failing to argue that the confession should have been suppressed or that trial counsel was ineffective, the petitioner cannot establish that counsel's alleged inadequacy deprived him of victory. The petitioner is required to show that his appellate

29

attorney was so thoroughly ineffective that defeat was "snatched from the jaws of victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 508 U.S. 975 (1993). Because the petitioner cannot make such a showing in the present case, he has failed to establish that the alleged ineffective assistance of appellate counsel constitutes sufficient cause to excuse the procedural default of habeas claims III, IV and V.

When a petitioner fails to establish cause and prejudice for a procedural default, relief may be granted only if the petitioner can show that refusal to hear his claims will result in a fundamental miscarriage of justice. *Murray v. Carrier*, 477 U.S. 478, 495 (1986). Such an exception requires a petitioner to support his allegations of constitutional error with new reliable evidence of his actual innocence of the crime for which he is imprisoned. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The petitioner has made no argument and presents no new evidence to show that he is actually innocent of the crimes for which he is in custody.

This court cannot grant relief to the petitioner on his procedurally-barred claims because he has failed to demonstrate cause and prejudice, and has failed to make a showing of actual innocence "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Schlup*, 523 U.S at 316. Thus, the court concludes that the petitioner is not entitled to habeas relief on his remaining claims.

**IV.  Conclusion**

For the reasons stated above, this court concludes that the petitioner is not entitled to federal habeas relief on the claims presented in his petition.


Accordingly, the court **DENIES WITH PREJUDICE** the petitioner's petition for writ of habeas corpus.  (Dkt. # 1.)

**IT IS SO ORDERED.**

                                    S/Bernard A. Friedman____
                                    BERNARD A. FRIEDMAN
                                    UNITED STATES DISTRICT JUDGE

DATED: September 28, 2009


I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

S/Carol Mullins
Case Manager