# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

T. J. TREMBLE, # 260818,

       Petitioner,

v.                                       Case Number: 06-cv-13945

                                               Honorable Bernard A. Friedman

SHERRY BURT,

       Respondent.

_____/

## OPINION AND ORDER
## CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, T. J. Tremble, a state inmate currently incarcerated at the Bellamy Creek Correctional Facility in Ionia, Michigan,[1] filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights.[2] Petitioner was convicted by an Arenac County, Michigan, circuit court jury of (1) two counts of first-degree murder, MICH. COMP. LAWS § 750.316, (2) one count of felony firearm, MICH. COMP. LAWS § 750.227b, and (3) one count of unlawfully driving away a motor vehicle (UDAA), MICH. COMP. LAWS § 750.413. He was fifteen-years old at the time of his convictions. Petitioner was sentenced,

---

[1]Petitioner was incarcerated at the Southern Michigan Correctional Facility in Jackson, Michigan, when he originally filed his habeas petition; however, he has since been transferred to the Bellamy Creek Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. The Court finds it unnecessary to do so in this case.

[2]On April 30, 2007, Bryan Stevenson and Rebecca C. Kiley from the Equal Justice Initiative of Alabama in Montgomery, Alabama, filed appearances on behalf of Petitioner. However, Ms. Kiley is no longer with the firm. Counsel also filed an extensive reply brief on April 30, 2007.

as an adult, to (1) life in prison without the possibility of parole for the first-degree-murder convictions, (2) two years in prison for the felony-firearm conviction, and (3) two to five years in prison for the UDAA conviction. In his pleadings, he alleges that (1) his confession was improperly admitted, (2) the trial court erred in refusing to change venue, (3) the prosecutor committed misconduct, and (4) both trial and appellate counsel were ineffective. For the reasons set forth below, the Court conditionally grants Petitioner's habeas petition on claims one, three, and four. The Court denies Petitioner habeas relief regarding claim two. As to that claim, the Court declines to issue Petitioner a certificate of appealability and denies him an application for leave to proceed on appeal *in forma pauperis*.

## I. BACKGROUND

### A. Substantive Facts

Petitioner's troubles in this case arise because of a shooting incident that occurred on April 19, 1997, resulting in the deaths of Peter and Ruth Stanley. The Stanleys were found dead in their home, in bed, with gunshot wounds to their heads. The gunshot wounds were caused by a .22 rifle. It is believed that the Stanleys were sleeping when they were shot. Petitioner was charged with their murders. He was fourteen-years-old at the time of the shootings.

Prior to trial, on September 18, 1997, a *Walker*[3] hearing was held to determine the admissibility of Petitioner's confession.

---

[3]*People v. Walker (On Reh'g)*, 374 Mich. 331, 132 N.W.2d 87 (1965). Also at the hearing, motions were heard regarding disqualification of the prosecuting attorney, change of venue, and a referral to probate court. Those motions were denied.

Officer Shon Chmielewski, Deputy Sheriff of Arenac County, testified first. According to the Officer, Petitioner was read his *Miranda*[4] rights when he arrived at the jail, somewhere between 2:55 a.m. and 3:13 a.m., during the fifteen-minute waiting period before he was given a breathalyzer test. Petitioner signed the card, did not ask for an attorney, and indicated that he wished to speak with an officer. At that time, Deputy William Lentz came into the room and told him that the Stanleys were found dead. Officer Chmielewski said he was present when Sheriff James Mosciski re-*Mirandized* and interviewed Petitioner, around 8:30 a.m. During that interview, Petitioner confessed to the murders. The interview was taped.

Corrections Officer Lori Kohn also testified at the *Walker* hearing. She said she first saw Petitioner in the booking room around 2:52 a.m. She said he was handcuffed. She also said he was offered food and something to drink, which he refused. Officer Kohn testified that Petitioner told her that he threw a flashlight into the river. She said the comment was unsolicited. She also noted that Petitioner had an abrasion on his hand.

Sheriff James Mosciski also testified at the *Walker* hearing. He said he was notified, about 3:15 a.m., by Officer Chmielewski about the incident. He said he immediately went to the station. When he arrived, he asked Petitioner if he had anything to say. Petitioner told him that the handcuffs were too tight; he said he then loosened the cuffs. He called Petitioner's parents about 5:30 a.m. They arrived at the station about 7:30 a.m., and requested to speak with their son. He told them that he wanted to speak to him first. Sheriff Mosciski said the parents were read their *Miranda* rights and signed the card.

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Sheriff Mosciski further testified that about 8:30 a.m., Petitioner was brought back to his office, at which time he then re-*Mirandized* him and asked him if he wished to talk, to which Petitioner replied, "Yes." *Walker* Hr'g Tr. 78, Sept. 18, 1997. Petitioner then confessed to the Stanley murders.

Petitioner's parents also testified at the *Walker* hearing. They both said they signed the *Miranda* form, asked to see their son, to which they were told they could not because the officers were questioning him, and asked for counsel.

Deborah Luberda, secretary to the prosecutor, also testified. According to her testimony, she heard Petitioner's father say that there was no reason to get "a high-powered attorney because they caught him with the evidence or in the act." *Walker* Hr'g Tr. 149-50, Sept. 18, 1997.

Subsequently, on October 6, 1997, the trial court issued a written, twenty-five-page opinion, denying the motion to suppress Petitioner's confession. The trial court stated in pertinent part:

> The Legislature having determined upon recent amendment of the laws of this state that a 14 year old may be accountable as an adult and waiver having occurred in this case, this Court must assess the "totality of the circumstances" in that light.
>
> A fair number of years prior to the recent Michigan Legislative enactments in the case [*Fare v. Michael C.*], 442 U.S. 707, 724[-25], [] (1979)[,] the United States Supreme Court in addressing the assessment of juveniles making statements when under suspicion for a crime indicated:
>
> > "We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights as opposed to whether an adult has done so."
>
> That having been said, this Court will resist the temptation to give into sympathy, and inappropriate consideration in its assessing of the 'totality of the circumstances.'
>
> * * *
>
> Other facts pertinent to the Court's assessment are as follows: Custody can

fairly be said to have been of short duration. By the time of interrogation with the Sheriff at 8:30 a.m., there was probable cause regarding murder charges. * * * Mr. Tremble was Mirandized twice. * * * There is no indication he is below average intelligence. * * * In short there is no record to support a finding by the Court that the Defendant was coerced into making his statement and accordingly this Court must conclude the statements made were voluntary.

*People v. Tremble*, No. 97-2455-FC, at *19-23 (Arenac County Circuit Court, Oct. 6, 1997).

At the *Walker* hearing, the trial court also heard argument regarding Petitioner's motion for a change in venue. The trial court expressed concern in attempting to find an impartial jury in the county because of the extensive media coverage. However, it was the trial court's opinion that an attempt should be made. The motion was therefore denied.

Trial began on October 21, 1997, and lasted five days. It took three-and-one-half days to impanel the jury. Testimony began on October 28, 1997.

Kerri Bussinger was first to testify. She said she saw Petitioner driving a black car on the night of the incident. According to Bussinger, he almost ran into her car.

Amy Vargo testified next. She said she was on her way to work that night when she noticed a car in the ditch. She said she stopped to help. Vargo said she took Petitioner back to her house in order to call a tow truck and then drove him back to the car. She described him as polite.

Officer Chmielewski also testified. His testimony at trial was similar to that given at the *Walker* hearing, with a few additions. Officer Chmielewski said he arrived at the scene at approximately 2:00 a.m. He said he asked Petitioner what happened. Petitioner told him that he swerved to miss a deer or a dog. When asked about his driver's license, Petitioner said he had no license. When asked about the car, Petitioner said the car belonged to his stepfather, Mr. Stanley. Petitioner told the Officer that his stepfather was at his grandfather's house. When questioned about the phone number, he responded that he did not know it. When asked the whereabouts of his

mother, Petitioner said she was working at a convenience store. Officer Chmielewski said he had dispatch call the store but the person at the store said that no one by that name was employed there.

Officer Chmielewski further testified that he asked Petitioner if the car was stolen. Petitioner told him that it was and said it was stolen from the Stanley's garage. Petitioner said he broke a window in the garage, unlocked the door, found the keys in the car, and then drove off. Officer Chmielewski said he smelled alcohol on Petitioner's breath, but said he was not slurring his speech and was not stumbling. While at the scene, Officer Chmielewski said he contacted Michael Prohaska, a probation officer. It was then that he discovered that Petitioner was fourteen-years-old. Petitioner was arrested at the scene for car theft and for driving while under the influence.

Officer Kohn's testimony was also similar to her testimony at the *Walker* hearing, with the following additions. She said she detected a slight order of alcohol on Petitioner's breath but that he did not slur his speech. She said he did not have any problems answering questions when asked.

Mary Jane Hart, another Corrections Officer, testified that she spoke to Petitioner while he was in the booking room. She said she never observed any slurred speech and detected only a slight odor of alcohol. It was her opinion that Petitioner was not intoxicated. Officer Hart also testified that the standard procedure for someone in the booking room was to be handcuffed if they were being charged with a serious crime. She said the length of time of the handcuffing usually depended on the arrest and on the charge. However, Officer Hart said that, in over eleven years of her experience, she had never seen anyone, adult or child, handcuffed for as long as Petitioner was.

Sheriff Mosciski's testimony was also similar to that given at the *Walker* hearing, with the following additions. He said when Officer Chmielewski called him, he told him about the incident and about a possible double homicide. According to Sheriff Mosciski, he spoke with Petitioner

when he arrived at the jail at about 3:35 a.m., at which time Petitioner only confessed to stealing the car. He said he told Petitioner that he would be in his office if he wanted to talk.

About twenty minutes later, Sheriff Mosciski went back to the booking room where Petitioner was being held and asked him if he had anything he wanted to talk about. That is when Petitioner told him that his handcuffs were too tight. Sheriff Mosciski said it was a normal procedure for defendants to be handcuffed for several hours, while in the booking room. Again, he told Petitioner that he would be in his office if he wanted to talk.

Sheriff Mosciski further testified that when he called Petitioner's parents, he told them that Petitioner was being held for driving while under the influence and possession of stolen property. According to Sheriff Mosciski, a police vehicle was then sent to their house.

Sheriff Mosciski testified that Mr. and Mrs. Tremble arrived at the police station around 7:30 a.m. Lieutenant Patricia A. Skarbek was present when he informed them why Petitioner was in custody. He told them that Petitioner was a suspect in a double homicide. The Trembles then asked to talk to their son, but he told them that he wanted to question him first. According to the Sheriff, the parents agreed that he could talk to Petitioner first. He believed that it was Mrs. Tremble who told him to tell Petitioner, "TJ, please come clean." Trial Tr. vol. VI, 1209, Oct. 29, 1997. He told the Trembles that it was normal procedure that he talk to their son first. He said the parents did not object. Sheriff Mosciski said he did not specifically ask the Trembles to sit in on the interview, and they did not ask to do so.

Sheriff Mosciski said he taped the interview. Officer Chmielewski, Lieutenant Skarbek, and Officer Lentz were present. The tape was admitted into evidence and played for the jury.

Petitioner's father, James Tremble, testified that he gave Petitioner a target gun, a .22 rifle,

which he kept in his bedroom. Mr. Tremble said after he received the call from the police, two officers came to his house and asked if they could search Petitioner's bedroom. Mr. Tremble consented to the search. Mr. Tremble also said he gave his son a beer that night. He said when he got to the police station he asked for counsel and also asked if he could speak to his son. He said he was refused both. Mr. Tremble said the request was made in the presence of Sheriff Mosciski and Lieutenant Skarbek.

Petitioner's mother, Beverly Jean Tremble, also testified. Mrs. Tremble acknowledged that she and her husband gave the two officers permission to search Petitioner's bedroom. She said she recalled seeing Petitioner's rifle in his bedroom that night before she went to bed. According to Mrs. Tremble, after the officers left their house, a friend took them to the police station. She testified that her husband told the officers to tell Petitioner to tell the truth. On cross-examination, she said she asked both the Sheriff and the Lieutenant if they could talk to their son but they both refused. She also testified that they asked for an attorney, and that the request was denied.

Lieutenant Skarbek testified that, when Petitioner was questioned, he appeared to be awake and alert and was not slurring his words. According to the Lieutenant, Petitioner's hands were cuffed behind his back in order to preserve evidence; it was believed that there were possible blood stains on his hands. Lieutenant Skarbek also testified that she believed the parent's request for a counselor was for counseling, such as a therapist. She said the Trembles mentioned that they had a lot of things going on in their lives and that they were on medication.

After five days of trial, Petitioner was convicted of the above-stated charges.

## B. Procedural Facts

Following his sentencing, Petitioner filed a direct appeal with the Michigan Court of Appeals raising the following three claims:

I.       The confession was improperly allowed into evidence.

II.      The revised automatic waiver statute used to charge and sentence [Petitioner] as an adult is unconstitutional.

III.     The trial court erred in refusing to change venue.

On February 1, 2000, the Michigan Court of Appeals issued an unpublished opinion affirming Petitioner's convictions and sentences. *People v. Tremble*, No. 208854, 2000 WL 33534678 (Mich.Ct.App. Feb. 1, 2000). Petitioner filed an application for leave to appeal the Court of Appeals's decision with the Michigan Supreme Court, raising the same claims. On December 4, 2001, the Michigan Supreme Court denied his application. *People v. Tremble*, 465 Mich. 920, 638 N.W.2d 749 (2001) (Cavanagh, J., and Kelly, J., would grant leave to appeal).

On November 5, 2002, Petitioner filed a motion for relief from judgment, pursuant Michigan Court Rules 6.500 *et. seq.*, in the trial court, raising the following four claims:

I.       [Petitioner] was denied due process of law and a fair trial when the prosecutor withheld key documents in violation of the rules of discovery.

II.      [Petitioner] was denied due process of law and a fair trial when the trial court erred in admitting [his] statement into evidence and in admitting evidence that was obtained as a result of an illegal search.

III.     [Petitioner] was denied the effective assistance of trial counsel when counsel failed to seek suppression of [his] statement on the proper legal basis, failed to seek to suppress the fruits of an illegal search, and where counsel conceded [his] guilt during closing argument.

IV.     [Petitioner] was denied the effective assistance of appellate counsel.

On December 18, 2003, the circuit court issued an order denying Petitioner's motion. *People*

*v. Tremble*, No. 97-2455-FC (Arenac County Circuit Court, Dec. 18, 2003). Petitioner appealed that

decision to the Michigan Court of Appeals. On April 7, 2005, the Court of Appeals denied the

application "for failure to meet the burden of establishing entitlement to relief under MCR

6.508(D)." *People v. Tremble*, No. 257439 (Mich.Ct.App. Apr. 7, 2005). Petitioner's subsequent

application for leave to appeal to the Michigan Supreme Court was denied on March 27, 2006, for

the same reason. *People v. Tremble*, 474 Mich. 1091, 711 N.W.2d 54 (2006).

On September 7, 2006, Petitioner filed the pending habeas petition challenging his

convictions on the following five grounds:

I.     [Petitioner's] confession was improperly admitted.

II.    The trial court erred in refusing to change venue.

III.   [Petitioner] was denied due process and a fair trial when the prosecutor
       withheld key documents in violation of the rules of discovery.

IV.    [Petitioner] was denied the effective assistance of counsel when defense
       counsel failed to seek suppression of [his] statement on the basis that it was
       in violation of his Fifth, Sixth, and Fourteenth Amendment rights against self
       incrimination and his right to counsel.

V.     [Petitioner] was denied the effective assistance of counsel on direct appeal
       in violation of U.S. Const. Amends. VI, XIV.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's

habeas review of state-court decisions. Under the AEDPA, a federal court's review of a habeas

proceeding is limited. A federal court may not grant a writ of habeas corpus unless the state

adjudication on the merits either:

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme Court
of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

The Supreme Court clarified that standard in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

With that standard in mind, the Court proceeds to address Petitioner's claims.

## III.  DISCUSSION

### A.  Petitioner's Confession

In his first habeas claim, Petitioner alleges that his confession should have been suppressed because it was given involuntarily.  Petitioner argues that, because he was fourteen-years-old at the time of his arrest, and because he was originally arrested for a zero-tolerance violation and possession of a stolen vehicle, the police were required to comply with the arrest procedures in the juvenile system, which mandated immediate removal to the juvenile division of the probate court. In addressing this claim, the Michigan Court of Appeals stated:

> Defendant, then fourteen years old, was arrested on April 19, 1997.  MCL 764.27; MSA 28.886, as amended by 1996 PA 255 (effective January 1, 1997), provides in pertinent part as follows:
>
> > Except as otherwise provided in section 606 of the revised judicature act of 1961 . . . being section 660.606 of the Michigan Compiled Laws . . . if a child less than 17 years of age is arrested, with or without a warrant, the child shall be taken immediately before the family division of circuit court of the county where the offense is

alleged to have been committed, and the officer making the arrest shall immediately make and file, or cause to be made and filed, a petition against the child as provided in . . . sections 712A.1 to 712A.31 of the Michigan Compiled Laws. [MCL 764.27; MSA 28.886.]

The statute, by its very terms, must be read in conjunction with M.C.L. § 600.606; MSA 27A.606, as amended by 1996 PA 260 (effective January 1, 1997), which provides that "[t]he circuit court has jurisdiction to hear and determine a specified juvenile violation if committed by a juvenile 14 years of age or older and less than 17 years of age." First-degree murder in violation of M.C.L. § 750.316; MSA 28.548 is listed as a specified juvenile violation under M.C.L. §600.606(2)(a); MSA 27A.606(2)(a). Under M.C.L. § 764.1f; MSA 28.860(6), the prosecutor has authority to proceed in either juvenile or circuit court when confronted with a juvenile who is charged with certain enumerated felonies, including first-degree murder.

There is no dispute that in this case the prosecutor opted to proceed in circuit court and charge defendant with first-degree murder. Defendant argues that because he was originally arrested only for a "zero tolerance" violation and possession of a stolen automobile, the police were required to comply with arrest procedures in the juvenile system and their failure to do so required suppression of his subsequent confession. However, the voluntary statement of a juvenile who is not immediately taken to the juvenile division of the probate court upon arrest is admissible if the juvenile is charged as an adult.

*Tremble*, 2000 WL 33534678, at *1-2 (citations omitted).

The Michigan Court of Appeals also held that, under the totality of all the circumstances,

Petitioner's statement to the police was voluntary:

In any event, the failure to take an arrested juvenile immediately to the juvenile division of the probate court does not per se require suppression of a statement made by the defendant. Rather, the proper test for determining the admissibility of a juvenile's confession is whether, under the totality of the circumstances, the defendant's statement was made voluntarily. The factors that must be considered in applying the totality of the circumstances test to determine the admissibility of a juvenile's confession include (1) whether the requirements of *Miranda v. Arizona*, have been met and the defendant clearly understands and waives those rights, (2) the degree of police compliance with M.C.L. § 764.27; MSA 28.886 and the juvenile court rules, (3) the presence of an adult parent, custodian, or guardian, (4) the juvenile defendant's personal background, (5) the accused's age, education and intelligence level, (6) the extent of the defendant's prior experience

with the police, (7) the length of detention before the statement was made, (8) the repeated and prolonged nature of the questioning, and (9) whether the accused was injured, intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food, sleep, or medical attention.

Here, defendant was given the *Miranda* warnings twice prior to his confession. He indicated that he understood his rights and he waived those rights. After reading defendant his *Miranda* rights, Sheriff Mosciski asked defendant if he wanted to "talk now" and defendant said "[y]es." As indicated above, because defendant was charged as an adult, the police were not required to comply with the requirements of M.C.L. § 764.27; MSA 28.886. Although neither defendant's parents nor an attorney were present during the questioning, defendant, after being advised of his rights, did not request the presence of his parents or an attorney. While defendant was only fourteen-and-a-half years old and only had an eighth grade education, there is nothing in the record to indicate that he could not read and write or could not understand the serious nature of the charges against him. In fact, a juvenile corrections officer explained to defendant, prior to his confession, that the charges against him were very serious. Moreover, there is nothing in the record to indicate that defendant was intellectually challenged.

Defendant was not detained for a lengthy period before he made his statement. He was brought into the jail at approximately 3:00 a.m. Defendant went through the booking procedure and submitted to a breathalyzer test. Evidence technicians from the State Police Post collected evidence from defendant at approximately 6:45 a.m. Defendant's parents appeared at the jail at 7:30 a.m. and consented to allow the police to talk to defendant. Defendant gave his statement at 8:30 a.m. We do not believe that defendant's five-and-a-half hour detention prior to his confession was unreasonable under the circumstances.

Furthermore, defendant does not claim, and there is no indication in the record, that he was subjected to repeated or prolonged questioning in this case. There is no indication that defendant was injured or sick when he confessed to killing the victims in this case. Additionally, although defendant had two alcoholic beverages approximately eight hours prior to the confession and had a blood alcohol level of .05 at 3:15 a.m., there is no indication that he was intoxicated at 8:30 a.m. when he confessed to the murders. Moreover, although defendant had not slept or eaten for at least nine hours prior to the questioning, there is no evidence that he was not alert at the time of his confession. In fact, Sheriff Mosciski testified that defendant appeared to be alert and awake during questioning. Defendant, who had eaten a sandwich at 11:30 p.m. the previous day, declined the breakfast that was offered breakfast at 7:30 a.m. at the jail. Therefore, he was not deprived of food prior to the confession. Although defendant was handcuffed for a number of hours, those handcuffs were loosened upon defendant's request. There is nothing in the record to indicate that defendant was mistreated in any way by the police.

> Considering the totality of the circumstances, we conclude that the trial court did not err in finding that defendant's confession was voluntary. Defendant has cited no factor or combination of factors that indicates that his will was overborne and his capacity for self-determination critically impaired, or that his confession was not the product of an essentially free and unconstrained choice. Although defendant claims that he was absolutely exhausted and utterly confused prior to his confession, there is no support for those assertions in the record.

*Tremble*, 2000 WL 33534678, at *2-3 (citations omitted).

This Court acknowledges that it is bound by the Michigan Court of Appeals' interpretation of the juvenile-offender law; the power of the writ of habeas corpus does not extend beyond the application of federal law, and federal courts cannot intervene in order to correct a perceived violation of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, a federal-habeas court does not sit "as an additional state appellate court to review a state court's interpretation of its own law or procedure. *Ovieda v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987) (citing *Combs v. Tennessee*, 530 F.2d 695 (6th Cir.), *cert. denied*, 425 U.S. 954 (1976)). Nor can a federal habeas court grant relief for a perceived error in the application of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The interpretation of Michigan's juvenile-offender statute is a state-law issue. The Michigan Court of Appeals specifically discussed Michigan law with respect to juveniles in custody, and, applying the facts of Petitioner's case to the law in question, it determined that, because Petitioner was charged as an adult, the juvenile court did not have jurisdiction over him.

The Court does not disagree with the Michigan Court of Appeals's decision that, MICH. COMP. LAWS § 764.27, the automatic waiver statute, allows the circuit court, rather than the juvenile court, jurisdiction over a juvenile who is charged with certain enumerated felonies. Petitioner was initially arrested for driving under the influence, when he was found with a vehicle that was not his

own.  While the police were attempting to immediately turn him over to the juvenile court, it was discovered that he was a suspect in a double homicide.  He was a suspect because the murdered couple owned the vehicle in which he was found.  Petitioner had only been at the police station for fifteen minutes prior to the double-homicide connection coming to light.  Thereafter, the police were under no obligation to transfer him to the juvenile court.  Thus, the Michigan Court of Appeals was correct in its assessment of this claim.

However, the Court finds Petitioner's involuntary-confession claim meritorious.  It is well-established that where a custodial police interrogation is conducted "without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his [or her] privilege against self-incrimination and his [or her] right to retained or appointed counsel."  *Miranda*, 384 U.S. at 475; *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986) (the Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused).  When a defendant claims that his or her confession was coerced, the government has the burden of proving that the confession was voluntary by a preponderance of the evidence.  *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).  "A confession is considered involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession."  *Hill v. Anderson*, 300 F.3d

679, 682 (6th Cir. 2002) (citing *Connelly*, 479 U.S. at 165-66; *United States v. Brown*, 66 F.3d 124, 126-27 (6th Cir. 1995)).

In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the United States Supreme Court held

that once the accused requests counsel, interrogation must cease until counsel has been made available, unless the suspect himself initiates further communication, exchanges, or conversation with the police. *See Minnick v. Mississippi*, 498 U.S. 146, 152 (1990) ("[w]e further hold that an accused, [], *having expressed his desire to deal with the police only through counsel*, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

First, analyzing this claim under *Edwards*, the Court finds that, in recounting the evidence leading up to Petitioner's interrogation by police, the state appellate court erroneously found that "there is no indication in the record, that [Petitioner] was subjected to repeated or prolonged questioning in the case." *Tremble*, 2000 WL 33534678, at *3. That finding was unreasonable. Rather, the evidence was uncontradicted that Petitioner, after recounting for the Sheriff what he had told his arresting officer (i.e., only that he had stolen a car), twice told the Sheriff that he did not want to speak with him. The second time, the Sheriff told him that if he changed his mind, he would be in his office. Moreover, Petitioner signed a *Miranda* Warning Form, in which he clearly indicated that he desired the assistance of counsel. And, his parents, who were not contacted for more than three hours after his arrest, eventually arrived at the jail and asked to see their son. They were refused. In fact, the Sheriff told them that he would like to talk to him first and never told them that Petitioner had refused to speak with him, twice.

There is no dispute that Petitioner never told anyone that he desired to speak, but was nonetheless escorted to the Sheriff's office, confronted with four law enforcement officers and questioned for a third time. Only then, about six hours after he was arrested, did Petitioner make

a statement which was used by the State to convict him.

The Sheriff's conduct in bringing Petitioner into his office for interrogation, in the presence of four officers, after Petitioner had twice invoked his right to silence, violated the "critical safeguard" of the "right to cut off questioning." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 474); *see also McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001) ("If there was ever any doubt that *Miranda* gives a suspect . . . the right to determine whether [a police] interview will proceed at all, that doubt was removed, as we see it, by *Michigan v. Mosley*."); *Berghuis v. Thompkins*,560 U.S. --, 130 S.Ct. 2250, 2259 (same). By ignoring the Sheriff's unlawful conduct in persisting in questioning a fourteen-year-old boy who had repeatedly invoked his right to remain silent, the state appellate court made an unreasonable factual determination. In the absence of that unreasonable factual determination, the Court of Appeals would have been compelled to hold that the Sheriff's Department failed to "scrupulously honor" Petitioner's right to silence under the Fifth Amendment. *Miranda*, 384 U.S. at 479; *Berghuis*, 560 U.S. --, 130 S.Ct. at 2259.

The Court of Appeals's factual recitation also ignored evidence that Petitioner's parents, after being told that the Sheriff wanted to speak to their son before they could, asked for counsel. That omission is particularly glaring in light of the fact that the trial court made a specific finding that this request was made and that law enforcement testimony interpreting it as a request for a psychologist was disingenuous. *Tremble*, No. 97-2455-FC, at *21 ("the officers interpretation of counsel to mean a psychologist or counselor in that vein as opposed to an attorney is somewhat disingenuous").

The Court of Appeals's omission was unreasonable; it failed to apply the bright-line rule of

*Edwards*, which established that once the right to counsel has been invoked by a person in custody, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights[,] . . . unless the accused himself initiates further conversation." *Edwards*, 451 U.S. at 484-85. Because Petitioner never initiated conversation with the Sheriff before the Sheriff began the interrogation which led to his statement, the Court of Appeals should have applied the rule of *Edwards* and suppressed Petitioner's statement to police.

Second, even if this Court were to find that the Court of Appeals was not required to apply *Edwards*, then clearly established federal law requires the Court to engage in a "totality of the circumstances" analysis to determine whether the confession was voluntary.[5] The voluntariness of a confession, whether made by a juvenile or an adult, is evaluated on the basis of the totality of the circumstances surrounding that confession. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)*; Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

In juvenile cases, the totality approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725 (citing *North Carolina v. Butler*, 441 U.S. 369 (1979)). The Supreme Court has spoken of the need to exercise "special caution" when assessing

---

[5]The State's answer seems to imply that because Petitioner's argument in state court that a state statute required him to be taken before a juvenile court immediately was unavailing, he is somehow not entitled to consideration of his claim that his statement was involuntary under a totality of the circumstances analysis. Of course, Petitioner's federal constitutional rights are not lost simply because an alternative state statutory argument fails.

the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. *In re Gault*, 387 U.S. 1, 45 (1967); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962); *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948).

In cases where a juvenile is involved, "[i]f counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Gault*, 387 U.S. at 55. "[W]hen . . . a mere child–an easy victim of the law–is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity." *Haley*, 332 U.S. at 599.

As recently as 2005, the Supreme Court reminded us of the special concern with which we should approach issues involving "juveniles under 18." The Supreme Court declared that "as any parent knows and as the scientific and sociological studies . . . tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations, alteration, and internal quotation marks omitted). "In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent." *Id.* (citation omitted).

It is uniformly agreed by the courts that the age of a defendant minor is an important factor

to be considered in determining the voluntariness of his or her confession. *Gallegos*, 370 U.S. at 53. However, minority status alone is insufficient to warrant a finding of involuntariness and inadmissibility. As a general rule, minority status is simply another factor to be considered in determining voluntariness. There is no distinct or separate rule of evidence applicable to confessions of minors.

Cases which have found a juvenile's confession involuntary often include some form of mental coercion, denial of rights, intimidation, threats, or physical abuse in obtaining the confession. For example, in *Haley*, *supra*, a fifteen-year old's confession was found involuntary after the boy was taken from his home in the middle of the night and subjected to relentless questioning. *Haley*, 332 U.S. at 597-601. The boy had been kept in custody for over three days without being taken before a magistrate or allowed to see a parent or attorney. *Id.* He was not informed of his right to counsel. And, once before the magistrate, the boy appeared "bruised and skinned." *Id.*

Similar to *Haley*, the Fifth Circuit found an eleven-year old's confession involuntary after the child had been held in custody, unaccompanied by a parent or lawyer, for over three days. *Murray v. Earle*, 405 F.3d 278, 288 (5th Cir.2005). The girl was found to be of "below-normal intelligence," had no experience with the criminal justice system, was only briefly informed of her rights prior to the interrogation, and the police told her that everyone "knew" what happened and she could only help her family by telling the truth. *Id.* at 288-289.

The coercion present in *Haley* and *Murray* starkly contrasts with two other cases where juveniles' confessions were found voluntary. In *Fare*, a sixteen-year old's confession was found to be voluntary where there was no evidence that the juvenile had been "worn down" by improper interrogation tactics, lengthy questioning, trickery, or deceit. *Fare*, 442 U.S. at 725-26. The boy

had been arrested several times and had considerable experience with police. *Id.* He was told he was being questioned in connection with a murder, his rights were explained fully, and no facts indicated he was unable to understand his rights. *Id.*

In *Gachot v. Stalder*, 298 F.3d 414, 420-21 (5th Cir. 2002), the Fifth Circuit found a fifteen-year old's confession to the murder of his parents voluntary, after he freely agreed to go to the sheriff's office to answer questions. *Id.* The boy was accompanied by his older half-brother, was

repeatedly advised of his rights, and the officers were "non-oppressive," treating him with "kid gloves." *Id.* at 420. He was not subject to physical abuse or relentless questioning, or confronted with "spurious untruths." *Id.*

In this case, the difficulty a vulnerable child of fourteen would have in making a critical decision about waiving his *Miranda* rights and voluntarily confessing cannot be understated. The *Fare* decision makes quite clear that all juvenile confessions are to be assessed under the totality of the circumstances standard, and that no one factor is dispositive. *Fare*, 442 U.S. at 725-27.

The Court finds that Petitioner's case is much more akin to the involuntary confessions in *Murray* and *Haley*, than those in *Gachot* and *Fare*. The Court finds that the Michigan Court of Appeals's determination that Petitioner's statement was not obtained in violation of his Fifth Amendment rights to counsel and against self-incrimination was based both on unreasonable factual determinations and an unreasonable application of clearly established federal law.

An unreasonable determination of the facts can occur where the state court's factual determination is contradicted by the evidence presented, *see*, e.g., *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (state court's "clear factual error" in concluding that social service records contained

evidence of sexual abuse, when they did not, was unreasonable under § 2254(d)(2)); *Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005) (state court's finding that counsel advised petition of right to testify at sentencing phase "cannot stand" because "flatly contradicted by testimony"), or where the state court's consideration of an issue overlooks important evidence, *see*, e.g., *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony" establishing that state manipulated racial composition of juries); *Guidry v. Dretke*, 397 F.3d 306, 325-27, 329 (5th Cir. 2005) (state court's unexplained omission of findings on evidence crucial to petitioner's habeas claim raised question of unreasonableness under § 2254(d)(2)).

In this case, the Michigan Court of Appeals made unreasonable factual determinations of both types which were critical to its consideration of the totality of the circumstances test for the voluntariness of a custodial statement.

The Court of Appeals identified the totality of the circumstances approach as the appropriate test, but failed to apply it reasonably to the facts of this case. The Court of Appeals swept over Petitioner's young age, fourteen, and his eighth-grade education in a sentence, concluding that nothing in the record indicated that "he could not read and write or could not understand the serious nature of the charges against him." *Tremble*, 2000 WL 33534678, at *3. Petitioner's extreme youth and lack of education were critical factors in this inquiry, and nothing in federal case law authorized the Court of Appeals to reduce its consideration of them to an inquiry into his literacy. The Court of Appeals's analysis failed to recognize the significance of a fourteen-year-old's "youth and immaturity." *Gallegos*, 370 U.S. at 54.

The Court of Appeals supported its conclusion that Petitioner could understand the gravity of the charges against him by noting that a juvenile corrections officer had explained to him "that the charges against him were very serious." *Tremble*, 2000 WL 33534678, at *3. The Court of Appeals consideration of that fact as weighing in favor of a finding that his statement was voluntary is unreasonable in light of the officer's testimony, which was: "I told him, 'Do you realize that you are being charged with a very serious offense here? If you know anything, if you didn't do this, you should be speaking up instead of just sitting there and saying nothing.'" Trial Tr. vol. V, 1132, Oct. 28, 1997. Rather than providing helpful counsel that he was in a serious situation and should be very careful in waiving any of his rights, the officer's statement, made after Petitioner had twice invoked his right to remain silent, was instead part of a pattern of police coercion in this case.

The Court of Appeals recognized that the interrogation was conducted outside the presence of Petitioner's parents or an attorney, but resolved that problem by noting that he did not ask for them to be present. Again, that logic fails to take into account that the conduct of a fourteen-year-old boy, alone and in police custody, cannot be viewed as if it were the conduct of an adult. Over forty years ago, the United States Supreme Court rejected the same logic:

> The prosecution says that the boy was advised of his right to counsel, but that he did not ask for either a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police.

*Gallegos*, 370 U.S. at 54.

The Court of Appeals also failed to recognize the impact of Petitioner's lengthy and uncomfortable detention. He was arrested at 1:55 a.m., and did not give his statement until 8:30 a.m. The Court of Appeals erroneously calculated his detention as beginning at 3:00 a.m., which is when he was brought to the jail, and concluded that his "five-and-a-half hour detention prior to his

confession" was not unreasonable under the circumstances. *Tremble*, 2000 WL 33534678, at *3.

However, the Court of Appeals failed to consider those circumstances. While a five- (or six-) and-a-half hour detention during the day might not be unreasonable for an adult defendant it was unreasonable in this case for police to keep Petitioner up all night until he provided a statement. It was also unreasonable for the Court of Appeals to conclude that the police's conduct in handcuffing him behind his back for several hours was not mistreatment. *Id.* The State's own witness, Officer Hart, testified that in over eleven years of experience she never saw anyone, adult or child, handcuffed as long as Petitioner was. Common sense dictates that such treatment would have been uncomfortable and contributed to the coercive circumstances surrounding Petitioner's statement.

There was uncontradicted testimony that Petitioner was apprised of his rights. And, according to the "Warning" form, Petitioner did in fact request to speak to an attorney. Pursuant to the "Warning," Petitioner signed the form, answered the question "Do you want an attorney?" with a "Yes," and signed the form at 4:05 a.m. Thus, the Court concludes that the form signed by Petitioner contained an unequivocal request for counsel. Petitioner's signed request for counsel constitutes an unambiguous request under *Edwards*, as required by *Davis v. United States*, 512 U.S. 452, 459 (1994):

> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) ("[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney") (citations and internal quotation marks

omitted).

In light of the request, the confession should not have been admitted at trial, because Petitioner was not provided an attorney before the police resumed questioning.

Therefore, under *Edwards* and taking into account the totality of the circumstances surrounding this case, the Court finds the following. At the time of his arrest, Petitioner was fourteen-years-old. He just completed the eighth grade. He did not alleged that he was illiterate or that he was not intelligent. He had one prior encounter with the legal system.

Nonetheless, the Court finds that Petitioner's detention was unreasonable. He was arrested about 2:30 a.m., and he made his alleged statement to the Sheriff at approximately 8:30 a.m. During that time period, he endured a sleepless night with his arms uncomfortably cuffed behind his back. Moreover, he told the Sheriff, twice, that he had nothing to say, only to be interrogated a third time, by the Sheriff and three other officers. Furthermore, Petitioner was intoxicated while in custody and had no contact with his parents, who repeatedly were denied access to him and whose multiple requests for an attorney were denied.

Viewing that evidence with "special caution," *Gault*, 387 U.S. at 45, and "extreme care," *Glinsey v. Parker*, 491 F.2d 337, 340 (6th Cir. 1974), the Court finds, under the totality of the circumstances, that Petitioner's Fifth Amendment rights were violated when his will was overborne by overzealous police officers, who coerced him into providing an involuntary confession.

## 1. Harmless Error Analysis

The Court of Appeals did not engage in a harmless-error analysis when it analyzed

Petitioner's involuntary confession claim.  The admission of an involuntary confession at trial is subject to harmless-error analysis.  *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991).  This Court finds that the unlawful admission of Petitioner's statement was not harmless error.

In a habeas corpus proceeding, to determine whether a constitutional trial error is harmless, a federal court must decide whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  "This standard reflects the 'presumption of finality and legality' that attaches to a conviction at the conclusion of direct review."  *Calderon v. Coleman*, 525 U.S. 141, 145 (1998) (quoting *Brecht*, 507 U.S. at 633).  "It protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights, [] while ensuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged."  *Id.* (internal quotations omitted).

If a federal judge in a habeas proceeding "is in grave doubt about whether a trial error of federal law has substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.  And, the petitioner must win."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation omitted).

In considering whether the admission of a coerced confession was harmless, "the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless."  *Fulminante*, 499 U.S. at 296.

> A confession is like no other evidence.  Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his

26

past conduct. Certainly, confessions have a profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton v. United States*, 391 U .S. at 139-140, 88 S.Ct. at 1630 (White, J., dissenting) . . . . While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of a crime may tempt the jury to rely upon that evidence alone in reaching its decision.

*Id.*

In *Fulminante*, the Supreme Court held that the admission of defendant's confession was not harmless error. Fulminante was convicted of murdering his eleven-year-old stepdaughter. Police lacked any physical evidence connecting Fulminante to the crime. He was ultimately prosecuted only after authorities learned that, while incarcerated on an unrelated charge, he confessed to the killing to an inmate, Anthony Sarivola, a former police officer who was working as a paid informant for the FBI. Following his release from prison, Fulminante also confessed to Sarivola's wife. Both confessions were admitted at trial.

The Supreme Court held that the first confession was coerced. It held that the admission of a coerced confession is subject to the harmless-error analysis, and, after evaluating the evidence presented, that it was not harmless error in this case. *Fulminante*, 499 U.S. at 306-09. In reaching that conclusion, the Supreme Court considered three main factors. First, absent the confessions, it was unlikely Fulminante would have been prosecuted because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict. *Id.* at 297. The prosecutor acknowledged the importance of the confession in both his opening and closing statements. Second, the jury's assessment of the reliability of Sarivola's wife's testimony regarding the second confession may have been influenced by the existence of the first, coerced confession. Absent testimony regarding the first confession, jurors may have been more skeptical of Sarivola's

wife's testimony, particularly because she had a motive to lie in that both she and her husband received significant benefits for their testimony. *Id.* at 298-99. Finally, admission of the first confession led to the admission of other prejudicial evidence against Fulminante. *Id.* at 300. Based upon the foregoing, the Supreme Court concluded that the admission of Fulminante's first, coerced confession was not harmless error.

In this case, similar to *Fulminante*, there is essentially one pieces of evidence against Petitioner: his confession. Considering that a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him," *Fulminante*, 499 U.S. at 296, that the evidence against Petitioner was far from overwhelming, the Court is in "grave doubt" about whether admission of the coerced confession had "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 436 (internal quotation omitted).

Moreover, in his closing argument, the prosecutor described Petitioner's statement as devastating. Nearly half of the prosecution's closing argument was focused on Petitioner's statement. The prosecutor's argument totaled forty-one pages of the trial transcript and Petitioner's statement is specifically referenced on twenty-three of those pages. *See Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006).

The Court concludes that the error in admitting Petitioner's statement was not harmless. Petitioner is entitled to habeas relief regarding his involuntary-confession claim.

## B. Change of Venue

Next, Petitioner asserts that the trial court erred in refusing to grant his request for a change

of venue because of the pretrial publicity surrounding his case. The Michigan Court of Appeals

considered and rejected this claim:

> The killings in this case occurred in a small community of approximately 1,000 residents. Defendant claims, and plaintiff admits, that there was pretrial publicity in this case. However, juror exposure to newspaper accounts of the crime for which a defendant has been charged does not in itself establish a presumption that the defendant has been deprived of a fair trial because of pretrial publicity. Rather, "the initial question is whether the effect of pretrial publicity on a relatively small jury pool . . . was such 'unrelenting prejudicial pretrial publicity [that] the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue.'"

> A review of the exhibit prepared by defendant in connection with his motion for change of venue reveals that, over a five-month period, there were eight articles regarding this case in the Arenac County Independent and twenty articles in The Bay City Times. Further, there is some indication that there was minor television and radio coverage of this case. Although defendant claims that some of the articles were somehow sensational or tabloid-like, a review of the articles reveals that they are largely a factual recounting of news events, including the basic facts surrounding the killings, the court proceedings and side issues such as where defendant would be housed during the pendency of this matter. The fact that a few of the articles mentioned that there seemed to be no reason for the killings or that there was no readily discernible motive for the murders does not make the articles inflammatory or sensational. We conclude that the pretrial publicity in this case was not so unrelenting or prejudicial that the entire community can be presumed to have been exposed to and prejudiced by it.

> The next question is whether there was such a high percentage of the venire who admitted to a disqualifying prejudice that community bias may be inferred. In *Jendrzejewski*, the Court found that even where twenty-five percent of the venire admits to a disqualifying prejudice, that does not constitute a community so prejudiced against the defendant as to impeach "the indifference of jurors who displayed no animus of their own." Our review of the record in this case shows that while many of the jurors admitted to having some prior knowledge of the incident in question, only about twenty-two percent admitted to having an opinion regarding the guilt or innocence of defendant. We do not believe that this suggests a community poisoned against defendant or a community "so inflamed by pretrial publicity that it would overcome jurors' assertions of impartiality." Therefore, we find that the trial court did not abuse its discretion in denying defendant's motion for change of venue.

*Tremble*, 2000 WL 33534678, at *4-5 (citations omitted).

The United States Supreme Court has held that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue. *Irvin v. Dowd*, 366 U.S. 717, 722-724 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Joseph v. Coyle*, 469 F.3d 441, 468 (6th Cir. 2006), *cert. denied*, 127 S.Ct. 1827 (2007); *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-943 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007); *Ritchie*, 313 F.3d at 952-953. For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000); *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court must still determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for determining if actual prejudice has occurred is a searching *voir dire* of prospective jurors. *Id.* The Supreme Court has rejected the notion that the trial court "must ask questions regarding the content of the news reports . . . to which potential jurors may have been exposed." *Joseph*, 469 F.3d at 468 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 424-25 (1991)). Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not

sufficient to rebut the presumption of a prospective juror's impartiality.  *Id.* at 366-367.  The

prospective juror must be able to lay aside his or her impressions or opinions and render a verdict

based upon the evidence presented in court.  *Ritchie*, 313 F.3d at 962.

While there was news coverage of the murders preceding trial, it was not extraordinary in

extent or substance.  Here, a review of the transcript does not indicate that Petitioner was denied a

fair trial.  Of the sixty-two jurors excused, only twenty-one were excused because they were not able

to keep an open mind–seventeen percent of the pool.  Federal precedent holds that even where

twenty-five percent of the jury pool indicated that they could not remain impartial, such a fact did

not reflect a community so inflamed by "pretrial publicity as to call into question the seated jurors'

assertions of impartiality."  *United States v. Morales*, 815 F.2d 725, 735 (1st Cir. 1987).

In this case, potential jurors were extensively questioned by the attorneys and the trial court,

over three-and-one-half-days of impaneling, to determine if they could be impartial and lay aside

any preexisting knowledge and opinions, if any existed.  The final fourteen jurors that were seated

as the panel swore under oath that they were able to keep an open mind as to the guilt or innocence

of Petitioner in this case.

Against that backdrop, the Court finds that the Michigan Court of Appeals' decision is

neither contrary to, not an unreasonable application of, clearly established Supreme Court precedent.

Therefore, Petitioner is denied habeas relief regarding his change-of-venue claim.


## C.  Prosecutorial Misconduct, Ineffective Assistance of Trial and Appellate Counsel Claims

In his third claim, Petitioner alleges that he was denied due process and a fair trial when the

prosecutor allegedly withheld a key document in violation of the rules of discovery.  In his fourth

claim, he asserts that he was denied the effective assistance of trial counsel when trial counsel failed to seek suppression of his statement on the basis that it was in violation of his Fifth, Sixth, and Fourteenth Amendment rights against self incrimination and his right to counsel.  And, in his fifth claim, Petitioner contends that he was denied the effective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment rights.

Although Petitioner presented these issues in his motion for relief from judgment and subsequent appeals, he failed to do so in his appeal of right.  A federal habeas court need not address a procedural-default issue before deciding against the petitioner on the merits.  *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008), *cert. denied*, --- U.S. ----, 129 S.Ct. 1986 (2009) (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.").  In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of Petitioner's remaining claims.

### 1. Prosecutorial Claim

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  In this case, Petitioner alleges that the prosecutor withheld his *Miranda* rights Warning Form from the defense.  *Brady v. Maryland*, 373 U.S. 831 (1963).  According to the Arenac County docket sheet, the Warning Form was filed with the trial court on July 28, 1997, along with the felony complaint.

Although Respondent argues that Petitioner cannot state with certainty whether the document

was withheld, the Court finds that Petitioner raises a broader prosecutorial misconduct claim under *Berger*. Regardless of whether the prosecutor literally withheld the document from the defense, the prosecutor nevertheless misrepresented the fact of Petitioner's request for counsel to the trial court. "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" is "implicit in any concept of ordered liberty." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Moreover, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275, n. 12 (1999) ( quoting *Kyles v. Whitely*, 514 U.S. 419, 437 (1995)). Thus, knowledge of the existence of the *Miranda* Warning Form, taken by the police, is imputed to the prosecutor in this case.

Despite that knowledge, the prosecutor permitted the police officers to testify at the *Walker* hearing that Petitioner never asked for counsel. And the State repeatedly argued in its supplemental *Walker* brief that Petitioner never requested counsel prior to his statement to the police. If the State had not misrepresented that evidence, the trial court would have been made aware that Petitioner invoked his right to counsel prior to his interrogation and the statement would have been suppressed under *Edwards*. "[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is an much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88.

Accordingly, the Court concludes that Petitioner is entitled to habeas relief on this claim.

## 2. Ineffective Assistance of Trial Counsel Claim

Petitioner alleges that trial counsel failed to seek the suppression of his statement on the ground that he had invoked his right to counsel by indicating so on his *Miranda* Warning Form.

Respondent argues that the claim is procedurally defaulted. However, Petitioner is excused from raising his ineffective-assistance-of-counsel claim in his direct appeal because the same attorney served as his trial and appellate counsel. *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004) ("[I]f the defendant was represented by the same counsel at trial and on direct appeal, claims of ineffective assistance of trial counsel are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial.") (citing *Buell v. Mitchell*, 274 F.3d 337, 348 n. 3 (6th Cir. 2001)); *Satterlee v. Wolfenbarger*, 374 F.Supp.2d 562, 572 (E.D. Mich. 2005). The Court therefore addresses this claim on the merits.

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant must show deficient performance and prejudice in order to make out an ineffective assistance of counsel claim. Satisfying the deficiency prong requires a showing that counsel's representation was objectively unreasonable under prevailing professional norms. *Id.* at 688. "[A]n action is not objectively reasonable unless it 'might be considered sound trial strategy.'" *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687-88).

In this case, because Petitioner invoked his right to counsel (as clearly indicated in the Warning Form), when initially interrogated while in police custody, and did not reinitiate a conversation with the police, his statement should have been suppressed. The Warning Form signed by Petitioner contained an unequivocal request for counsel. The failure to present that form at the

*Walker* hearing constituted ineffective assistance of counsel in violation of Petitioner's Sixth Amendment rights.

Trial counsel's failure to present the Warning Form at the suppression hearing was

objectively unreasonable; there was no sound strategy for not doing so. The Warning Form had been filed with Arenac County Clerk more than a month before the suppression hearing was held. It was unreasonable for trial counsel to conduct the suppression hearing without reviewing the documents in the court file. *See Brown v. Smith*, 551 F.3d 424, 431-35 (6th Cir. 2008) (granting habeas corpus relief on ineffective assistance of counsel claim where attorney failed to review counseling records containing critical information for impeaching State's primary witness); *Leonard v. Michigan*, 256 F.Supp.2d 723, 733 (W.D. Mich. 2003) ("How defense counsel could have proceeded to trial, knowing the critical piece of evidence against his client was DNA evidence, without first reviewing the experts' reports, protocol, and analysis is almost incomprehensible and certainly unreasonable.")

"It is the [State's] burden to establish a waiver [of *Miranda* rights] by a preponderance of the evidence." *Untied States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008) (citing *Connelly*, 479 U.S. at 168). At the *Walker* hearing, the State repeatedly attempted to meet its burden by proving that the police advised Petitioner of his rights and that he never requested assistance. However, that testimony and argument was contradicted by the Warning Form. Had defense counsel introduced that form, it could have been cross-examination material, which could have undermined the testimony, and thus, the credibility of the police officers. The form demonstrates that the police ignored his request. Even if the State were able to establish that Petitioner did not want an attorney and that the notation was accidental, the existence of the Warning Form would raise serious concerns about his understanding of his rights and the intelligence of his waiver.

This Court must determine "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

Defense counsel's lack of preparation for that trial is indefensible. In light of the circumstances of this case and the central role Petitioner's statement played in his conviction, defense counsel's lack of preparation is the definition of ineffective assistance of counsel and for the Court of Appeals to have found otherwise is unreasonable.

The Court finds that, had defense counsel introduced the Warning Form and made the appropriate *Edwards* challenge to the admissibility of Petitioner's confession at the *Walker* hearing, the statement would have been suppressed. Petitioner's statement represented the State's strongest evidence against him, because there were no other witnesses to the crime and no other direct evidence linked him to the murders.

After Petitioner requested counsel, the police were required to cease questioning him until he had a lawyer present. The police's failure to cease questioning Petitioner, that is, both (1) Sheriff Mosciski's returning to Petitioner, reading him his *Miranda* rights, and proceeding to interrogate him, and (2) the police questioning that continued, violated Petitioner's right to counsel, the contours of which are clearly established by federal law and Supreme Court precedent. *Minnick*, 498 U.S. at 153-54. Furthermore, because Petitioner's statement was self-incriminating and among the most significant evidence marshaled against him by the State, its admission was not harmless, *supra* section III, A, 1.

The Court's decision is not altered by the fact that, after requesting counsel, Petitioner was re-read his *Miranda* rights, signed a waiver of them, and proceeded to make a statement.


Accordingly, the Court concludes that Petitioner is entitled to habeas relief on his ineffective-assistance-of-counsel claim.

### 3. Ineffective Assistance of Appellate Counsel Claim

Petitioner also alleges that his appellate counsel was ineffective for failing to challenge the improper admission of his confession and for failing to challenge his own ineffectiveness in not presenting the *Miranda* Warning Form to the trial court. For reasons stated in the above arguments, the Court also concludes that Petitioner is entitled to habeas relief regarding this claim.

### IV. CONCLUSION

For the reasons stated above, this Court concludes that Petitioner is entitled to federal habeas relief on the following claims presented in his habeas petition: (1) his confession was improperly admitted, (2) prosecutorial misconduct, and (3) trial and appellate counsel were ineffective. The Court denies Petitioner habeas relief regarding his change of venue claim.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S .C. § 2253(c)(2). A certificate of appealability must indicate which specific issues satisfy this requirement. 28 U.S.C. § 2253(c) (3).

"Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court carefully considers the ground for relief regarding Petitioner's change of venue claim, and concludes that Petitioner cannot demonstrate a denial of a constitutional right. The Court

is not persuaded that reasonable jurists would find its conclusion debatable or wrong.

Accordingly, **IT IS ORDERED** that the Court **CONDITIONALLY GRANTS** Petitioner's petition for writ of habeas corpus regarding his improper-confession claim, his prosecutorial misconduct claim, and his ineffective-assistance-of-counsel claims, both trial and appellate. (Dkt. # 1.)

**IT IS FURTHER ORDERED** that the Court denies Petitioner's request for habeas relief regarding his change-of-venue claim.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a certificate of appealability regarding his change-of-venue claim.

## V.  ORDER

**IT IS HEREBY ORDERED:**

That Petitioner's Petition for Writ of Habeas Corpus is conditionally granted.  Unless the State takes action to afford Petitioner a new trial within ninety (90) days of the date of this order, he may apply for a writ ordering Respondent to release him from custody.

**SO ORDERED**.

        _s/Bernard A. Friedman_
        BERNARD A. FRIEDMAN
        UNITED STATES DISTRICT JUDGE

DATED: _September 1, 2010___

I hereby certify that a copy of the foregoing document was served upon counsel of record by electronic and/or first class-mail.

        s/Felicia Moses for Carol Mullins
        Case Manager